**Emily A. Swenson (No. 12257)**
Emily A. Swenson, PC
2661 Washington Blvd., Suite 103
Ogden, Utah 84401
Telephone: (801) 409-0271
*easwensonatty@gmail.com*

*Attorney for Defendant Daysi Benitez-Sosa*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>DAYSI BENITEZ-SOSA,<br><br>        Defendant. | Case No. 1:15-cr-00077<br><br>Hon. Jill N. Parrish |

DEFENDANT'S MEMORANDUM IN SUPPORT OF AMENDED

MOTION TO SUPPRESS EVIDENCE

**COMES NOW** Defendant Daysi Benitez-Sosa, by and through Counsel Emily A. Swenson, and files a Memorandum in Support of the Amended Motion to Suppress Evidence per the Court's order of February 10, 2017 as follows:

**INTRODUCTION**

Defendant Daysi Benitez-Sosa is charged with conspiracy to distribute and conspiracy to possess with intent to distribute methamphetamine. The details of her arrest, questioning by the police, and search of her home were outlined in her previous motion to suppress. (ECF No. 84, filed Jan. 13, 2017). At the motion hearing on February 10, the United States called Deputy Russell Baer of the Davis County Sheriff's Office who had questioned Benitez-Sosa and passed on information she was giving him in real time and passed off this information to the officers

1

searching her home. Without this guidance, the officers would not have located the items the government plans to use as evidence against her.

At the hearing on the amended motion to suppress, counsel for the United States conceded error as to the questioning of Benitez-Sosa and stipulated that the government would not use any of her statements against her. It did not concede error on admission of the evidence found as a result of those statements. The Court directed Benitez-Sosa to file a supplemental statement outlining why each of the pieces of evidence should be suppressed.

These are the items found by the police that Benitez-Sosa seeks to suppress are as follows:

1. Currency found in the search, located inside boots in a closet. Evidence Receipt E1500781, Item # 1, (Exhibit 2 on Motion and D's Exhibit 1 at Suppression Hearing). This same piece of evidence was photographed by the officers at the scene, admitted in the suppression hearing and marked as Government's Exhibit 6.

2. Methamphetamine located in a utility closet safe under the stairs. E1500781, Item # 3. (Exhibit 2 on Motion and D's Exhibit 1 at Suppression Hearing). This same piece of evidence was photographed at the scene, admitted in the suppression hearing and marked as Government's Exhibits 7-10.[1]

3. Methamphetamine found in a box in the front room under numerous items of clothing. E1500781, Item # 4. (Exhibit 2 on Motion and D's Exhibit 1 at Suppression Hearing). This same piece of evidence was photographed by officers at the scene, admitted in the suppression hearing and marked at Government's Exhibits11-13.

---

[1] The combination was provided by Benitez-Sosa.

4. Currency located in the bedroom closet. E1500781, Item # 5. (Exhibit 2 on Motion and D's Exhibit 1 at Suppression Hearing). This same piece of evidence was photographed at the scene, admitted in the suppression hearing and marked as Government's Exhibits 14 and 15.

5. Currency found in a safe in the closet. E1500781, Item # 7. (Exhibit 2 and D's Exhibit 1 at Suppression Hearing). This same piece of evidence was photographed by officers at the scene, admitted in the suppression hearing and marked as Government's Exhibit 16.[2]

**ARGUMENT**

Benitez-Sosa previously made her arguments on the voluntariness of her statements and the evidence found being "fruits of the poisonous tree" in her prior motion and will not repeat them here.

The United States argues for the inevitable discovery doctrine under *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 250, 181 L.Ed.2d 377 (1984). When the government argues that evidence should be permitted under the inevitable discovery doctrine, the burden is on the government to show that the evidence would have been found. *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000). The government must show there is a "high level of confidence" that discovery would have occurred. *Id.* at 1205. It must also prove its case for inevitable discovery by a preponderance of the evidence. *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

In cases where the government has been able to prevail on the inevitable discovery doctrine, the government has had officers who were at the scene testify. *E.g., Souza*, 223 F.3d at 1199, *United States v. Christy*, 810 F.Supp.2d 1219, 1242-43 (D.N.M. 2011), *aff'd* 739 F.3d 534

---

[2] The location for the key to this safe was provided to law enforcement by Benitez-Sosa.

(10th Cir. 2014).  Cf. *United States v. Cabassa*, 782 F.Supp. 226, 228 (S.D.N.Y. 1992) (hearing evidence from officers on scene and finding evidence would have inevitably been discovered), *rev'd* 62 F.3d 470 (2d Cir. 1995) (reversing finding of inevitable discovery and suppressing evidence).

At the motion hearing, the government had the burden to produce evidence to support its claims of inevitable discovery.  It conceded at the hearing that Benitez-Sosa's statements were improperly obtained and were inadmissible.  The government called only one witness, Russell Baer, who was not at the scene of the search.  His entire testimony was hearsay and speculation.

Baer testified as to what should have happened in a "perfect search" based on photographs of the scene, documents about the search, and his training and experience.  But the fact of the matter is that he was not there at the scene and could not render any first-hand knowledge as to what did actually take place.  He did not see what the officers searching saw nor was he present for their internal discussions.  He did not know what resources and tools were available to the officers.  He didn't testify about other details such as time schedules of the officers, whether they had to leave or were about to go off shift or whether or not some other urgent call took precedence.  Baer's testimony based on his training and experience that the property would be thoroughly examined was not borne out by the reality of how the search was actually conducted.

Baer originally said that in his experience properties were always completely searched. (Tr. 43:12-13).  "Every space that a person can fit, that drugs can fit, that we can access, we search," Baer said.  (Tr. 68:10-11).  Baer emphasized the thoroughness of a typical search: "We flip over every mattress and look at it. We flip over box springs to make sure that there's no tears (sic) in the fabric underneath, or zippers. We turn couches over, look underneath them. We

attempt to unzip the backs of couches and look inside them if they have those. We search inside couch cushions." (Tr. 68:13-18).

Baer said the possibility that rooms would not be checked was unlikely: "I would be very, very, very shocked," to learn that was the case, he testified. (Tr. 66:18). Baer testified that even if the items sought by the search warrant were found, officers would continue to search the property from top to bottom. (Tr. 43:7-14, 44:8-16).

Baer also testified in contradiction to his above statements when cross examined about the thoroughness of searches by specifically stating, "I'm human. I'm sure there is possibility for human error on certain things, yes." (Tr. 39: 20-21). Baer testified his agency, Davis Metro Narcotics, as well as Weber Morgan Narcotics Strike Force ("WMNSF") and some Federal Agents participated in the search. (See Tr. 45). When questioned about the fact that he was not present during the search, he could not testify whether or not his practices were followed. (Tr. 45:21-25. 46:1-2). Baer also agreed that he wouldn't ever really know if anything was missed on a search and said, "I guess you could assume that if you don't find anything, you might have missed something." (Tr. 43:5-60). He further acknowledged that a magazine for a firearm was found in Benitez-Sosa's search but yet the Officers didn't find a gun. (Tr. 42:24-25, 43:1-2). Baer when asked if he would be surprised that in an unrelated case involving WMNSF Agents they only searched two storage sheds after obtaining warrants for four. He stated: "It wouldn't surprise me. It's not our unit's case. It's another unit's case. Their practices are according to their supervisors and their agencies." (*See* Tr.44:17-22). Further when questioned: "It's fair to say you weren't there, so your practice necessarily wasn't followed, correct? You can't speak to whether it was or wasn't, correct?" (Tr. 45:22-25) He replied: "I would say that's a fair statement because I was not there." (Tr. 46:1-2).

Benitez-Sosa testified that the only two rooms of her home that were in "disarray" were the living room and her bedroom. (Tr. 84: 21-25.). Besides those two rooms and one bathroom, the only places she thought had been searched were the places she had directed Baer to instruct the officers to search. She testified there was nothing out of order in the kitchen, the baby's room appeared untouched, one bathroom was still in the same condition as she had left it, no panels to the ceiling appeared to have been opened and/or removed, and the couch cushions were still in place.

The government failed to introduce any first-hand evidence of what exactly happened at Benitez-Sosa's home. It failed to carry its burden to show, by a preponderance of the evidence, that the evidence at issue would have inevitably been discovered.

The Court ordered Benitez-Sosa to detail arguments for each individual item. Those arguments follow.

*1. Currency found in the search, located inside boots in a closet*

The police found currency inside boots in a closet. Baer testified that from looking at photographs he believed the boots were found in a closet in Benitez-Sosa's bedroom. (Tr. 46:3-15). But Baer could not be certain they were in Benitez-Sosa's bedroom or another bedroom in the apartment as he had never visited the premises and knew it only from photographs. (Tr. 46:19 to 47:1).

Benitez-Sosa told Agent Baer during her interview, while the search was in progress, that she had about $10,000.00 of U.S. Currency that could be located in her house. (Sosa Interview Tr. 14:20-24, Government's Exhibit 1). Information of the money was passed on to the officers on the scene by Agent Witzel. (*Id*. at 82:17-19). Without this guidance, there is no evidence to show that officers would have located the boots and the money contained in them.

*2. Methamphetamine located in the basement utility closet safe*

The police found methamphetamine in a safe with a combination lock. Benitez-Sosa told the police the combination to open its lock. (Sosa Interview 81:23-82:5).

Giving the combination to a lock is a testimonial statement. *United States v. Green*, 272 F.3d 748, 753 (5th Cir. 2001). In *Green*, the defendant asked for a lawyer. Despite this request, the police asked the defendant to unlock the combination lock on a gun safe. Because the police kept asking questions after the defendant invoked his right to counsel, all statements were tainted as was the evidence found in the gun safe.

In *United States v. Mabe*, 330 F.Supp.2d 1234 (D. Utah 2004), the police falsely told the defendant that they had a warrant to search his home. All statements made during the search of his home were also tainted by the coercion and ultimately suppressed. The defendant gave the police access to his home and led them to evidence. Some of the evidence was in a closet secured by a combination lock. The defendant unlocked a combination lock for them. The physical evidence recovered was suppressed because the search was coerced and tainted by the actions of the police.[3]

Baer testified Benitez-Sosa gave him the combination to the safe and that he passed this combination to the officers executing the warrant. (Tr. 63:13). The government cannot rely on the inevitable discovery doctrine here. Baer testified that in his experience, officers executing search warrants can break into safes using a Hooligan tool. (Tr. 70:5-9). But Baer was not present at the scene. (Tr. 69:1). He had no actual knowledge of what tools were available to the

---

[3] Admittedly this case is distinguished by the fact the Agents had a warrant here. The case is merely instructive of the outcome that applies in the context of unlawful police action.

7

officers on the scene. Baer also testified that officers generally did not take safes from the property where they were found, but left them in place after photographing them. (Tr. 64:15-19).

Because Baer (1) did not have knowledge of the tools available to the officers on the scene and (2) stated officers in his experience do not remove safes, the government cannot show that the contents of the safe would have been inevitably discovered. There is no evidence in the record to show that the officers could have entered the safe without Benitez-Sosa providing the combination. And Baer's testimony that safes were not removed from property forecloses the argument that the safe could have been taken by the police to be opened later when the tools were available to them.

Benitez-Sosa's statements to the officer about the location of the safe and the combination to open it were tainted. The government cannot claim that inevitable discovery would have led them to open it. The methamphetamine found in the safe should be suppressed.

*3. Methamphetamine found in a box in the front room*

The police found methamphetamine in a box in the front room of Benitez-Sosa's home. Baer testified that officers were searching for twenty pounds of methamphetamine they believed Benitez-Sosa to have in her possession. (Tr. 57:14-17). Fifteen pounds of it were located in a vehicle. (Tr. 57:21-22). Six more pounds were found in another location. (Tr. 58:2-8). At this point officers had exceeded the amount they expected to find by one pound. Baer's testimony indicates it was unanticipated that Benitez-Sosa had another four pounds. (Tr. 58: 1-19).

Benitez-Sosa directed the officers to the box. (Tr. 60: 10-25, 61:1-11). Baer testified he did not know if the methamphetamine was found before or after Benitez-Sosa's statement about its location. (Tr. 76:20-22). The box was a sealed shipping box under a pile of towels. No first-hand testimony was offered that the pile would have been examined or the box opened. It was

found and opened because Benitez-Sosa directed the officers to it. Without this guidance, there is no testimony to suggest that officers on the scene would have located the box nor opened it to reveal its contents.

### 4. *Currency located in the bedroom closet*

The police found currency inside a closet. Baer testified that it came from a bedroom closet, but he could not state which bedroom the closet was in. (Tr. 77:2-3). But Baer could not be certain they were in Benitez-Sosa's bedroom or another bedroom in the apartment as he had never visited the premises and knew it only from photographs. (Tr. 46:19 to 47:1). Benitez-Sosa told Agent Baer that she had about $10,000.00 of U.S. Currency that could be located in her house. (Sosa Interview Tr. 14:20-24, Government's Exhibit 1). Information of the money was passed on to the officers on the scene by Agent Witzel. (*Id*. at 82:17-19).

Benitez-Sosa gave information that the Currency would be found in her home and Witzel passed it on to the officers on the scene. Without this guidance, there is no testimony that the officers on the scene would have located the boots and the money contained in them.

### 5. *Currency found in a safe in the closet downstairs*

The police found currency in a safe secured with a key lock. Benitez-Sosa told the police where to find the safe and where to find the key to open its lock. (Tr. 31:20-24) (Sosa Interview 80:8-15, 80:24-81:19).

As with the first safe, Baer's had no first-hand knowledge of the scene. Nor did he know what tools were available to the officers on the scene to enter the safes. Benitez-Sosa testified that the only two rooms of her home that were in "disarray" were the living room and her bedroom. (Tr. 84: 21-25). Yet, Baer said that in his experience properties were always completely searched. (Tr. 43:12-13). There is no testimony in the record to show that the

officers searching the property would have found the second safe—let alone its key—but for the statements given by Benitez-Sosa. There is no evidence that they would have been able to enter the second safe but for the statements given by Benitez-Sosa.

As explained above with the first safe, the caselaw holds that evidence found in safes whose openings were procured by tainted testimony should be suppressed. The evidence located within the second safe should be suppressed.

## CONCLUSION

The United States has conceded that Benitez-Sosa's statements are inadmissible because they were obtained in a coercive manner. The evidence found as a result of those inadmissible statements is also inadmissible as fruit of the poisonous tree. The United States has failed to meet its burden of showing the inevitable discovery of the items to overcome the taint from the improper questioning of Benitez-Sosa. The Court should suppress the items found as a result of questioning Benitez-Sosa.

**DATED** this 17th day of March, 2017.

*/s/ Emily A. Swenson*
Emily A. Swenson
*Attorney for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of March, 2016, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the following:

    US Attorney's Office (UT)
    Via Email
    Stewart M. Young
    Tyler L. Murray

                                              */s/ Emily A. Swenson*
                                              Emily A. Swenson
                                              *Attorney for Defendant*